# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CYNTHIA SALGUERO, *individually and on behalf of all others similarly situated*, | Case No. 1:25-cv-02139 |
| | **Hon. Manish S. Shah** |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| MONDELEZ INTERNATIONAL, INC. | |
| Defendant. | |

Plaintiff Cynthia Salguero ("Plaintiff"), by and through undersigned counsel, brings this class action complaint against Defendant Mondelez International, Inc. ("Mondelez," or "Defendant"), individually and on behalf of all others similarly situated. The following allegations are made against Defendant pursuant to the investigation of Plaintiff's counsel and based upon information and belief—except those allegations specifically pertaining to Plaintiff herself and her counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.      This putative class action against Defendant arises out of Defendant's false and misleading marketing, advertising, and packaging in relation to its Clif Kid products, including its ZBar and ZBar Protein products ("ZBars" or the "Product"). At the heart of this Complaint is Defendant's misleading statements regarding the environmental benefits of the Product. Specifically, Defendant chose to emblazon the Product's packaging with a representation that it is "Climate Neutral." In reality, Defendant's claim is untrue and deceptive.

2.      The manufacturing, marketing, and transportation of the Product contributes to climate change and degradation, exerts a negative impact on the climate, and exceeds any benefit the Product may provide to the climate.

3.      Defendant markets ZBars as "delicious energy snack bars" that "deliver great taste and energizing whole grains from organic oats to help fuel active kids during play."[1]

4.      Clif Kid falls under the Clif brand, which was acquired by Mondelez for $2.9 billion in 2022.[2] The Clif brand touts its products as "good food that does good."[3] These representations play an important role in creating a general marketing ethos that casts Clif as a family-owned brand which realizes that "sustaining [its] business, [its] brands, [its] people, [its] communities, and the planet [is] a better return on investment than one bottom line."[4]

5.      The Product is distributed in the United States by Mondelez Global LLC, a wholly owned subsidiary of Defendant.

6.      The Product offers an explicitly child-centered version of the traditional Clif Bar. Accordingly, Defendant, via its Clif Kid branding, represents that it "strives to help protect the planet for today's kids, and for future generations":

---

[1] https://shop.clifbar.com/collections/clif-kid-zbar?product-line=zbar. (last visited Dec. 12, 2024).
[2] Salvador Rodriguez, *Mondelez to Acquire Clif Bar for $2.9 Billion*, THE WALL STREET JOURNAL (June 20, 2022), https://www.wsj.com/articles/mondelez-to-acquire-clif-bar-for-2-9-billion-11655760068. (last visited Dec. 9, 2024).
[3] https://www.clifbar.com/who-we-are/food-values#ingredients. (last visited Dec. 12, 2024).
[4] https://www.clifbar.com/who-we-are/our-journey. (last visited Dec. 12, 2024).



**(Figure 1)**

7.     Additionally on its packaging, Defendant represents that the Product is "Climate Neutral" in large, bolded font, with "certified" in fine print below:



**(Figure 2)**

8. The Federal Trade Commission ("FTC") warns companies against overbroad, vague, and unbounded claims such as the claim made by Defendant regarding the Product. In its "Green Guides" for environmental marketing claims, the FTC states that "[u]nqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of

4

meanings."[5] Further, "[b]ecause it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, marketers should not make unqualified general environmental benefit claims."[6]

9. The FTC also warns that marketers are responsible for substantiating claims about a product that are reasonably implied or conveyed by the use of an environmental certification.[7] This is especially true where the certification or seal "does not convey the basis for the certification or seal, either through the name or some other means."[8]

10. Unfortunately, the exact scenario anticipated in the Green Guides has played out here. Because Defendant fails to provide an indication that the "Climate Neutral Certified" representation stems from any source other than Defendant itself, let alone a third-party certification process that does not actually require climate neutrality for certification, Defendant must substantiate all reasonable interpretations of "Climate Neutral Certified." Based on Defendant's representation, reasonable consumers reviewing the Product's label and packaging reasonably believed that the manufacturing, marketing, and distribution of the Product is sustainable and does not exert a negative impact on the environment nor contribute to climate change or degradation—that is, reasonable consumers believed that the Product was actually climate neutral.

11. Unfortunately, this conclusion is false. Defendant's manufacturing and transportation of the Product causes carbon dioxide ("CO2") and other greenhouse gases to be released in the atmosphere, contributing to climate change and harming the environment. Indeed, the Product that Defendant advertises as "climate neutral" results annually in the emission of

---

[5] 16 C.F.R. § 260.4(b).

[6] *Id.*

[7] 16 C.F.R. § 260.3.

[8] *Id.*

roughly 54,000 tons of carbon dioxide equivalent.[9] This is equivalent to the annual emissions of 12,596 gasoline-powered automobiles.[10] Therefore, Defendant's climate neutral claim is false and misleading because the Product's manufacturing and distribution results in substantial carbon emissions, other greenhouse gas emissions, and harm to the climate.

12.    Plaintiff and other similarly situated consumers would not have purchased the Product—or would have paid substantially less for it—had they known that the climate neutral claim was not true. Because Defendant cannot substantiate this reasonable interpretation of its claim, it has violated 16 C.F.R. § 260.4.

13.    Thus, reasonable consumers would interpret "climate neutral certified" to mean that the Product *itself* does not contribute to climate change or degradation. However, as alleged, the Product itself *does* contribute to climate change and degradation. Consequently, Defendant's "climate neutral" representation is false and misleading.

14.    Defendant may argue that the Product, when *combined with* Defendant's purchase of carbon offsets and credits, does not contribute to climate change or degradation and, as a result, is "climate neutral." However, because of fundamental flaws in the offsetting market and the kinds of projects in which Defendant purportedly invests, Defendant's reliance on such offsets is unjustified. As a result, Defendant's "climate neutral" claim is misleading. And, again, Defendant does not purport to have done anything to its business operations to render its products "climate neutral".

---

[9] *Clif Kid*, CHANGE CLIMATE PROJECT, https://explore.changeclimate.org/brand/clif-kid (last visited Dec. 17, 2024); *What Does tCO2e Mean?* EMISOFT, https://www.emisoft.com/en/kunnskapssenter/ghg-protokollen/hva-betyr-tco2e-2/ (last visited Dec. 17, 2024) (tCO2e, or tons of CO2 equivalents is a term that is used to calculate and express greenhouse gas emissions).

[10] *Greenhouse Gas Equivalencies Calculator*, EPA, https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator (last visited December 20, 2024).

15. Foundational issues with the offset market[11] mean that the mere purchasing of such offsets does not justify a "climate neutral" claim. Primary offset vendors offer offsets and credits replete with the following:

    a. Inaccurate accounting;

    b. Non-additional effects on worldwide carbon levels due to the vendors crediting offsets for projects that would have occurred with or without offset market investment;

    c. Non-immediate speculative emissions reductions that will at best occur over decades, despite crediting purchasers with the sum of those projected offsets; and

    d. Impermanent projects subject to disease, natural disasters, and human intervention.[12]

16. These issues are specific to the types of offsets purchased by and relied upon by Defendant. Investment in offset projects of the same nature as those on which Defendant's "climate neutral" claim is premised have been found to grossly misstate the actual reduction in emissions

---

[11] The "offsetting market" refers to a marketplace in which individuals, companies, and state actors seek to compensate part or all of their emissions footprint, usually by purchasing carbon credits or investing in projects that reduce emissions outside of these purchasers' own value chains. See infra, ¶¶ 40-44; Carbon Offsetting, CARBON MARKET WATCH, https://carbonmarketwatch.org/carbon-offsetting/ (last visited Dec. 20, 2024).

[12] See Nina Lakhani, *Revealed: Top Carbon Offset Projects May Not Cut Planet-Heating Emissions*, THE GUARDIAN, (Sep. 19, 2023) https://www.theguardian.com/environment/2023/sep/19/do-carbon-credit-reduce-emissions-greenhouse-gases (last visited Dec. 17, 2024); Alex Fredman & Todd Phillips, *The CFTC Should Raise Standards and Mitigate Fraud in the Carbon Offsets Market*, CENTER FOR AMERICAN PROGRESS, (Oct. 7, 2022) https://www.americanprogress.org/article/the-cftc-should-raise-standards-and-mitigate-fraud-in-the-carbon-offsets-market/ (last visited Dec. 23, 2024) (noting that "[a] substantial body of scientific research and investigative reporting has revealed that, for a variety of reasons, many offsets simply do not achieve the results they claim"); Natasha White, *Bogus Carbon Credits are a 'Pervasive' Problem, Scientists Warn*, TIME, (Mar. 21, 2023) https://time.com/6264772/study-most-carbon-credits-are-bogus/ (last visited Dec. 23, 2024) ("A study covering almost 300 carbon offset projects found that the industry's top registries have consistently allowed developers to claim far more climate-saving benefits than justified.").

achieved.[13] Inaccuracy and fraud are widespread within the offset industry.[14] Defendant either knew or should have known of the fundamental unreliability of offsets yet chose to rely on offsets in making its "climate neutral" representation. Accordingly, Defendant's "climate neutral" claim— without further disclosure or clarification—is effectively a misrepresentation about the accuracy of Defendant's offsetting.

17.     Defendant's statements exceed the scope of mere puffery or a trivial marketing ploy. To the contrary, Defendant charges more for the Product based on its representation that the Product is "climate neutral certified". Moreover, Defendant knows consumers will pay a premium for products they understand to be environmentally friendly. Indeed, large corporations like Defendant have increasingly sought to capitalize on heightened consumer demand for environmentally friendly products by exaggerating or misstating the ecological impact of their wares—a process known as "greenwashing."[15] A look at the rest of the Product's packaging, which portrays a bucolic scene with lush fields, dense forest, and a clear blue sky, underscores this fact.[16] Indeed, Defendant specifically touts its commitment to "protect the planet for today's kids, and for future generations."[17]

18.     As a result of Defendant's greenwashing, Plaintiff and other consumers have suffered an economic injury. Because the product is not actually "climate neutral," as that term is understood by reasonable consumers, Plaintiff and other consumers were deprived of the benefit

---

[13] *Id.*
[14] *Id.*
[15] *See Greenwashing—The Deceptive Tactics Behind Environmental Claims*, UNITED NATIONS, https://www.un.org/en/climatechange/science/climate-issues/greenwashing (last visited January 8, 2025).
[16] *See supra*, Fig. 1.
[17] *Id.*

of their bargain when they paid a price premium for a product they believed was "climate neutral," but instead received a product that was not.

19.     Plaintiff is a purchaser of the Product who asserts claims on behalf of herself and similarly situated consumers of the Product for: (i) breach of express warranty, (ii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, (iii) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and (iv) unjust enrichment.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332 (d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over one hundred members of the putative class, and at least one class member is a citizen of a state different than that of Defendant.

21.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District.

## PARTIES

23.     Plaintiff Cynthia Salguero is a resident of Anaheim, California who has an intent to remain there and is therefore a citizen of California. Plaintiff Salguero has purchased the Product on multiple occasions. On November 10, 2024, Plaintiff Salguero purchased a 36-count package of the Product from a Sam's Club located in Fullerton, California for $21.98. Prior to her purchase of the Product, Plaintiff Salguero reviewed the Product's labeling and packaging and saw that the

Product was labeled and marketed as "climate neutral." In purchasing the Product, Plaintiff Salguero relied on Defendant's representations that the Product was climate neutral. Plaintiff Salguero saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that the Product did not negatively impact the climate or environment. Plaintiff Salguero understood "climate neutral" to mean that the Product's manufacturing did not produce harmful greenhouse gases or otherwise cause pollution. Plaintiff Salguero relied on these representations and warranties in deciding to purchase the Product. Because of this reliance, those representations and warranties comprised part of the basis for the bargain, in that Plaintiff Salguero would not have purchased the Product or would not have purchased the Product on the same terms had she known that those representations were false. In making her purchase, Plaintiff Salguero paid a price premium due to the false and misleading climate neutral claim. Plaintiff Salguero did not receive the benefit of her bargain because the Product was not, in fact, climate neutral since its manufacturing produced greenhouse gasses and/or caused pollution.

24.     Defendant Mondelez International Inc. is a Virginia corporation with its principal place of business at 905 West Fulton Market, Chicago, Illinois 60607. Defendant is one of the largest snack companies in the world, with a global net revenue of approximately $36 billion.[18] Defendant markets, sells, and distributes the Product throughout the United States including in the State of California. Defendant manufactured, marketed, and sold the Product during the relevant time period.

---

[18] *See* https://www.mondelezinternational.com/about-us/ (last visited December 9, 2024).

## FACTUAL ALLEGATIONS

**A.      The Climate Crisis**

25.      There is a growing concern about the climate crisis, which the United Nations describes as "the defining crisis of our time."[19] A 2021 study found that seventy-eight (78) percent of people feel the collective threat of man-made damage to the planet.[20] These anxieties persist across all age groups, gender, educational, and socioeconomic backgrounds, with climate change ranking as the most important global environmental concern of our time, followed by water and air pollution.[21]

26.      The heart of climate change lies in the "greenhouse effect." The greenhouse effect refers to the natural warming of the Earth that results when gases in the atmosphere trap heat from the sun that would otherwise escape into space.[22] While the greenhouse effect, in and of itself, is a positive phenomenon which allows for a livable environment on Earth, "the voracious burning of fossil fuels for energy is artificially amping up" this natural mechanism.[23] Under the natural greenhouse effect process, around thirty (30) percent of the solar energy that reaches Earth's surface is reflected back into space, while the remaining seventy (70) percent is absorbed by the Earth's surface and atmosphere.[24] Over time, the thirty (30) percent of heat that is absorbed radiates

---

[19] *See The Climate Crisis – A Race We Can Win*, UNITED NATIONS, https://www.un.org/en/un75/climate-crisis-race-we-can-win (last visited November 11, 2024*); The Climate Crisis: Working Together for Future Generations*, U.S. DEPARTMENT OF STATE, https://www.state.gov/policy-issues/climate-crisis/ (last visited December 12, 2024).

[20] Michael Sheldrick, *Increasing Global Concern About The Climate Is A Message To World Leaders*, FORBES (Oct. 28, 2021), https://www.forbes.com/sites/globalcitizen/2021/10/28/increasing-global-concern-about-the-climate-is-a-message-to-world-leaders/?sh=6db94ac3c11f (last visited December 12, 2024).

[21] *Id.*

[22] Melissa Denchak, *Greenhouse Effect 101*, NATURAL RESOURCES DEFENSE COUNCIL (July 16, 2019), https://www.nrdc.org/stories/greenhouse-effect-101 (last visited December 12, 2024).

[23] *Id.*

[24] *Id.*

back as infrared light.[25] Although some of this infrared light proceeds through the atmosphere into space, the majority is absorbed by atmospheric gases ("greenhouse gases") which causes further warming on Earth.[26] Below is a description of the greenhouse effect.[27]



27.     Greenhouse gases generated by human activities have long been the most significant driver of observed climate change.[28] Indeed, nineteenth-century scientists recognized the greenhouse effect and speculated about its long-term effect on the climate.[29] Some perspective

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Greenhouse Gases*, CLIMATE CHANGE RESOURCES, https://climatechangeresources.org/greenhouse-gases/ (last visited December 13, 2024).
[29] *See* Svante Arrhenius, *On the Influence of Carbonic Acid in the Air upon the Temperature of the Ground*, PHILOSOPHICAL MAGAZINE AND JOURNAL OF SCIENCE, Series 5, Vol. 41 p. 237-276 (1896), https://www.rsc.org/images/Arrhenius1896_tcm18-173546.pdf (last visited December 13, 2024).

is instructive on this point. For the vast majority of human civilization's existence, the concentration of CO2 in the atmosphere was roughly between 200 and 280 parts per million.[30] In the past century, however, the concentration of CO2 in the atmosphere has skyrocketed past 420 parts per million—a fifty percent increase to preindustrial levels.[31] While CO2 is the most common greenhouse gas emitted by human activity, the atmospheric concentration of other gases, such as methane, has also skyrocketed over the last hundred years.[32] This increase is driven largely by the burning of fossil fuels and escalated deforestation.[33] Because of the higher concentration of greenhouse gasses, extra heat is trapped which leads to climate change.[34]

28. The catastrophic effects of climate change have garnered worldwide recognition.[35] The United Nations has described the current climate emergency as "the defining crisis of our time."[36] In recent years, Americans have experienced firsthand the devastation that stems from climate change. Wildfires have destroyed homes and decreased air quality; extreme heat and relentless downpours have inflicted chaos on American infrastructure like roads, rail lines, airports, port facilities, and military bases; rising sea levels and the proliferation of severe coastal storms have increased the risk of erosion and flooding in coastal communities; and disrupted ecological patterns are projected to diminish the security of America's food supply.[37]

---

[30] Melissa Denchak, *Greenhouse Effect 101*, NATURAL RESOURCES DEFENSE COUNCIL (July 16, 2019), https://www.nrdc.org/stories/greenhouse-effect-101#causes (last visited December 13, 2024).

[31] *Id.*

[32] *See Methane*, NASA (June 2024), https://climate.nasa.gov/vital-signs/methane/?intent=121 (last visited Dec. 13, 2024).

[33] Denchak, *supra* note 20.

[34] *Id.*

[35] *The Climate Crisis: Working Together for Future Generations*, U.S. DEPARTMENT OF STATE, https://www.state.gov/policy-issues/climate-crisis/ (last visited Dec. 9, 2024).

[36] See The Climate Crisis – A Race We Can Win, UNITED NATIONS, https://digitallibrary.un.org/record/3898930?v=pdf (last visited Dec. 9, 2024).

[37] *Impacts of Climate Change*, EPA, https://www.epa.gov/climatechange-science/impacts-climate-change (last visited Dec. 9, 2024).

29.     The crushing effects of climate change have engendered widespread concern among consumers. As a result, consumers like Plaintiff increasingly seek out sustainable products in an effort to reduce their environmental footprint. Indeed, a recent survey found that roughly seventy (70) percent of consumers in the U.S. and Canada consider a brand's sustainability and environmental impact before making a purchase.[38] The same survey also found that seventy (70) percent of consumers who value sustainability would be willing to pay, on average, thirty-five (35) percent more for brands they perceive as eco-friendly.[39]

30.     Importantly, among younger demographics, the percentage of consumers who would spend more on a product that comes from a sustainable brand jumps to sixty-four (64) percent for Generation X and seventy-five (75) percent among millennials.

31.     Further, companies that express a commitment to combat climate change experience a sizeable increase in sales.[40] These facts underscore the growing trend among modern consumers—they are more likely to purchase, and willing to pay more for, environmentally friendly products that do not contribute to climate change.

32.     This consumer trend has given birth to a marketing tactic called "greenwashing."

**B.      Greenwashing**

33.     Greenwashing refers to the "activities by a company or an organization that are intended to make people think that it is concerned about the environment, even if its real business

---

[38] Dinara Bekmagambetova, *Two-Thirds of North Americans Prefer Eco-Friendly Brands, Study Finds*, BARRON'S, Jan. 10, 2020, https://www.barrons.com/articles/two-thirds-of-north-americans-prefer-eco-friendly-brands-study-finds-51578661728 (last visited Dec. 11, 2024).
[39] *Id.*
[40] *Your Customers and Employees Expect You to Lead on Climate*, CHANGE CLIMATE, https://www.changeclimate.org/why-get-certified (last visited Dec. 9, 2024).

practice actually harms the environment," or is not as "green" as the company claims to be.[41] "[C]ompanies engaged in greenwashing typically exaggerate their claims or the benefits in an attempt to mislead consumers."[42]

34.     Companies like Defendant have strong incentives to greenwash their businesses and products because consumers, like Plaintiff, desire to purchase products that are better for the environment because they result in less pollution, are less energy intensive, and require fewer natural resource inputs. The increasing prevalence of this consumer attitude has substantially impacted consumer buying behavior and, as a result, has substantially impacted companies' marketing campaigns and strategies.

35.     Indeed, consumers interested in more environmentally friendly products are challenged and deceived every day by companies' ever-evolving, misleading greenwashing claims.

36.     In a released study, the environmental consulting group TerraChoice Environmental Marketing found that ninety-eight (98) percent of more than 2,000 products it surveyed in North America made false and misleading environmental claims by committing one or more of what it classified as the "Seven Sins of Greenwashing"[43]:

    a.  The Sin of the Hidden Trade-off—committed by suggesting a product is "green" based on an unreasonably narrow set of attributes without attention to other important environmental issues;

---

[41] *Greenwashing*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/greenwash_v?tab=meaning_and_use#11644342, (last visited Dec. 9, 2024).
[42] *Greenwashing*, INVESTOPEDIA, https://www.investopedia.com/terms/g/greenwashing.asp (last visited Dec. 9, 2024).
[43] *Sins of Greenwashing*, UL SOLUTIONS, https://www.ul.com/insights/sins-greenwashing (last visited Dec. 9, 2024).

b. The Sin of No Proof—committed by an environmental claim that cannot be substantiated by easily accessible supporting information;

c. The Sin of Vagueness—committed by every claim that is so poorly defined or broad that its real meaning is likely to be misunderstood by the consumer;

d. The Sin of Irrelevance—committed by making an environmental claim that may be truthful but is unimportant or unhelpful for consumers seeking environmentally preferable products;

e. The Sin of Lesser of Two Evils—committed by claims that may be true within the product category but risk distracting the consumer from the greater environmental impacts of the category as a whole;

f. The Sin of Fibbing—committed by making environmental claims that are simply false; and

g. The Sin of Worshipping False Labels—committed by a product that, through either words or images, gives the impression of third-party endorsement where no such endorsement actually exists or uses fake labels.

37. To put it simply, portraying oneself as environmentally friendly offers an enormous boon to corporate actors. Accordingly, corporations like Defendant will do whatever it takes to appear environmentally conscious and sustainable. Recognizing this problem, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims.

## C. FTC Regulation of Greenwashing and the Green Guides

38. Faced with mounting evidence that some companies, like Defendant, will do whatever it takes to appear environmentally conscious, sustainable, and eco-friendly in order to

16

boost their bottom line, the FTC created Green Guides to help companies avoid making misleading and deceptive claims.[44] These guides are based on extensive consumer research and offer guidance to companies and provide guidance in cases like the present, where consumers were likely to be misled by Defendant's environmental representations. More specifically, the FTC published the Green Guides as guidance "to help marketers avoid making environmental marketing claims that are unfair or deceptive" under the FTC Act.[45]

39.     Section 5 of the FTC Act prohibits deceptive acts and practices in or affecting commerce. A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and it is material to consumers' decisions.[46]

40.     In the context of environmental marketing claims, a reasonable basis for the claim is often required. Such a basis consists of tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons. Additionally, this evidence should be sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considering the entire body of relevant and reliable scientific evidence, to substantiate that all reasonable interpretations of the marketing claim are true.[47]

41.     According to the FTC, the following general principles apply to environmental marketing claims:[48]

> a. *Qualifications and Disclosures*: To prevent deceptive claims, qualifications and disclosures should be clear, prominent, and understandable. To make disclosures clear and prominent, marketers should use plain language and sufficiently large type, should place disclosures in close proximity to the qualified claim, and should avoid making inconsistent statements or using distracting elements that could undercut or contradict the disclosure.

---

[44] *See generally* 16 C.F.R. § 260—Guide for the User of Environmental Marketing Claims.
[45] *Id.*
[46] *See* FTC Policy Statement on Deception, 103 FTC 174 (1983).
[47] *See* 16 C.F.R. § 260.
[48] 16 C.F.R. § 260.3.

b. *Distinction Between Benefits of Product, Package, and Service*: Unless it is clear from the context, an environmental marketing claim should specify whether it refers to the product, the product's packaging, a service, or just to a portion of the product, package, or service. In general, if the environmental attribute applies to all but minor, incidental components of a product or package, the marketer need not qualify the claim to identify that fact. However, there may be exceptions to this general principle. For example, if a marketer makes an unqualified recyclable claim, and the presence of the incidental component significantly limits the ability to recycle the product, the claim would be deceptive.

    i. Example: A plastic package containing a new shower curtain is labeled "recyclable" without further elaboration. Because the context of the claim does not make clear whether it refers to the plastic package or the shower curtain, the claim is deceptive if any part of either the package or the curtain, other than minor, incidental components, cannot be recycled.

c. *Overstatement of Environmental Attribute*: An environmental marketing claim should not overstate, directly or by implication, an environmental attribute or benefit. Marketers should not state or imply environmental benefits if the benefits are negligible.

d. *Comparative Claims*: Comparative environmental marketing claims should be clear to avoid consumer confusion about the comparison. Marketers should have substantiation for the comparison.

e. *Certifications and Seals of Approval*: It is deceptive to misrepresent, directly or by implication, that a product, package, or service has been endorsed or certified by an independent third party. **A marketer's use of an environmental certification or seal of approval likely conveys that the product offers a general environmental benefit if the certification or seal does not convey the basis for the certification or seal, either through the name or some other means.** (emphasis added).

42. The FTC determined that "[u]nqualified general environmental benefit claims…likely convey that the product…has specific and far-reaching environmental benefits and may convey that the item…has no negative environmental impact."[49] Additionally, the FTC has

---

[49] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, FTC (Apr. 2, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/04/ftc-sends-warning-letters-companies-regarding-diamond-ad-disclosures (last visited Dec. 9, 2024); *see also* FTC Green Guides, 16 C.F.R. § 260.4(b) (2012).

stated that "[m]arketers still are responsible for substantiating consumers' reasonable understanding of [these claims]."[50]

43.     The Green Guides also provide examples of deceptive marketing claims to "provide the Commission's views on how reasonable consumers likely interpret certain claims."[51] The FTC provided the following relevant examples:

  a.  The brand name "Eco-friendly" likely conveys that the product has far reaching environmental benefits and may convey that the product has no negative environmental impact. Because it is highly unlikely that the marketer can substantiate these claims, the use of such a brand name is deceptive.

  b.  A product label contains an environmental seal, either in the form of a globe icon, or a globe icon with the text "Earth Smart." EarthSmart is an independent, third-party certifier with appropriate expertise in evaluating chemical emissions of products. While the marketer meets EarthSmart's standards for reduced chemical emissions during the product usage, the product has no other specific environmental benefits. Either seal likely conveys that the product has far-reaching environmental benefits, and that EarthSmart certified the product for all these benefits. If the marketer cannot substantiate these claims, the use of the seal would be deceptive. The seal would not be deceptive if the marketer accompanied it with clear and prominent language clearly conveying that the certification refers only to specific and limited benefits.

**D.  Plaintiff and Reasonable Consumers Were Misled by Defendant's "Climate Neutral Certified" Representation on the Product**

  1.  *Reasonable consumers understand "climate neutral" to mean that the Product itself does not contribute to climate change or degradation*

44.     The United Nations has defined "climate neutral" as "the idea of achieving net zero greenhouse gas emissions by balancing those emissions so that they are equal to, or less than, the emissions removed…In basic terms, it means we reduce our emissions through climate action to ensure no net effect on the climate system."[52] At first blush, "climate neutral" bears similarities to

---

[50] *The Green Guides, Statement of Basis and Purpose*, FTC (Oct. 1, 2012) https://bit.ly/2TQ7GL9 at 258 (last visited Dec. 9, 2024).
[51] 16 C.F.R. § 260.1(d).
[52] *A Beginner's Guide to Climate Neutrality*, UNITED NATIONS, (Feb. 26, 2021), https://unfccc.int/news/a-beginner-s-guide-to-climate-neutrality (last visited Dec. 9, 2024).

"carbon neutral"—a separate environmental sustainability claim. Carbon neutral is defined as "having or resulting in no net addition of carbon dioxide to the atmosphere."[53]

45.     However, unlike more concrete environmental terms such as "carbon neutral," the term "climate neutral" does not have a commonly accepted or dictionary definition to aid interpretation by those without an expansive knowledge of environmental language.[54]

46.     A reasonable consumer could interpret "climate neutral" to mean that the manufacturing, distribution, and marketing of the Product does not contribute to climate change or otherwise exert a negative effect on the climate. Under this reading, a reasonable consumer would believe that, at the point of purchase, the creation and distribution of the "climate neutral" Product had not contributed to climate change. That is to say, the Product *itself* is neutral with respect to climate change or degradation. Unfortunately, this is not the case.

> 2.     *Even if reasonable consumers understood that "climate neutral" refers to offsetting, Defendant's claim is still misleading and deceptive*

47.     Although not disclosed the packaging, Defendant's use of the "climate neutral" seal apparently refers to the fact that Defendant has received third-party certification from the Change Climate Project ("Change Climate").[55] Change Climate is a third-party organization that claims to help companies measure, manage, and reduce the footprint of their products. To achieve "climate neutral" certification from Change Climate, a company must: 1) measure their emissions from "cradle to customer" over the course of a calendar year, 2) create a "reduction action plan" that sets targets for reducing emissions, and 3) offset any remaining emissions through the purchase of

---

[53] *Carbon-neutral*, MERRIAM-WEBSTER (2022); *see also A Beginner's Guide to Climate Neutrality*, UNITED NATIONS CLIMATE CHANGE, (Feb. 26, 2021), https://unfccc.int/blog/a-beginner-s-guide-to-climate-neutrality (last visited Dec. 10, 2024).
[54] *See Carbon-neutral*, MERRIAM-WEBSTER (2022); *Carbon neutral*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/carbon-neutral (last visited Dec. 9, 2024).
[55] *CLIF Kid*, CHANGE CLIMATE PROJECT, https://explore.changeclimate.org/brand/clif-kid (last visited Dec. 9, 2024).

carbon credits.[56] A company's compliance with its own plan is evaluated at specified intervals years after the company sets its initial reduction targets.[57] However, even if a company fails to meet its own checkpoints, it may still achieve and maintain "climate neutral" status by demonstrating "significant pending reduction actions, or that [it] is following a separate but clear reduction plan."[58]

48.     This process of—ostensibly—compensating for one's emissions via investment in projects that theoretically reduce emissions elsewhere on the globe is known as "offsetting."[59] These investments, often packaged into "credits" sold by brokers, represent an enormous and rapidly growing industry.[60] In 2022, the global carbon offset market was valued at roughly $2 billion and is expected to balloon to a $100 billion industry by 2030.[61] Companies have increasingly utilized offsetting in order to represent that their products are environmentally friendly or "neutral."[62]

49.     However, reasonable consumers do not understand that this billion-dollar offset industry is what companies like Defendant base their environmental claims upon. Further,

[56] *The Climate Neutral Certified Standard*, CHANGE CLIMATE, (Sep. 24, 2024) https://www.changeclimate.org/standards?_gl=1*1u56d4e*_gcl_aw*R0NMLjE3MzEwNzQ1N DMuRUFJYUlRb2JDaE1JcDVpXy1QSE1pUU1Wdml6VUFSMU9qUldvRUFBWUFpQUFFZ 0tCZWZEX0J3RQ..*_gcl_au*MTg5MTgxOTgyNC4xNzMwOTkzNzk1*_ga*NDE3MTkwMjc 1LjE3MzA5OTM3OTU.*_ga_1SDE6PM5XZ*MTczMzg0Njc1OC4yMi4xLjE3MzM4NDY3Nz cuNDEuMC4w (last visited Dec. 9, 2024).
[57] *Id.*
[58] *Id.*
[59] Umair Irfan, *Can You Really Negate Your Carbon Emissions? Carbon Offsets, Explained*, VOX, (Feb. 27, 2020), https://www.vox.com/2020/2/27/20994118/carbon-offset-climate-change-net-zero-neutral-emissions (last visited Dec. 11, 2024).
[60] *Id.*
[61] *Where the Carbon Offset Market is Poised to Surge*, MORGAN STANLEY, (Apr. 11, 2023), https://www.morganstanley.com/ideas/carbon-offset-market-growth (last visited Dec. 11, 2024).
[62] Nina Lakhani, *Revealed: Top Carbon Offset Projects May Not Cut Planet-Heating Emissions*, THE GUARDIAN (Sep. 19, 2023) https://www.theguardian.com/environment/2023/sep/19/do-carbon-credit-reduce-emissions-greenhouse-gases (last visited Dec. 11, 2024).

companies like Defendant fail to actively or adequately explain the offset market or the calculations behind "neutral" environmental claims made to consumers. Nowhere on the Product's packaging does Defendant reference the Change Climate Project or offsetting. Defendant provides no information as to how Change Climate calculates "offsets" or where these offsets are theoretically taking place. Defendant fails even to clearly direct consumers to an external resource for further information.

50.    Even setting this lack of consumer awareness aside, the emissions offsetting market itself "is awash with challenges, fuzzy math and tough-to-prove claims" that make "climate neutral" claims misleading.[63] A recent study performed by Corporate Accountability and The Guardian found that "[t]he vast majority of the environmental projects most frequently used to offset greenhouse gas emissions appear to have fundamental failings suggesting they cannot be relied upon."[64] Because of these failings, many criticize the market for emissions offsets as a form of greenwashing which allows corporations to "buy complacency, political apathy[,] and self-satisfaction."[65]

51.    A fundamental question swirling around the offset market is whether offset organizations actually achieve the emissions savings they promise—savings on which Defendant and accreditation agencies like the Climate Change Project rely when conferring "climate neutral"

---

[63] Josh Lederman, *Corporations Are Turning to Forest Credits in the Race To Go 'Carbon-neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Dec. 5, 2021), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259 (last accessed Dec. 11, 2024).

[64] Nina Lakhani, *Revealed: Top Carbon Offset Projects May Not Cut Planet-Heating Emissions*, THE GUARDIAN (Sep. 19, 2023) https://www.theguardian.com/environment/2023/sep/19/do-carbon-credit-reduce-emissions-greenhouse-gases (last accessed Dec. 11, 2024).

[65] George Monbiot, *Paying For Our Sins*, THE GUARDIAN (Oct. 18, 2006), https://www.theguardian.com/environment/2006/oct/18/green.guardiansocietysupplement (last visited Dec. 11, 2024); *see also* Susan Shain, *Are Flight Offsets Worth It?*, N.Y. TIMES (May 6, 2024), https://www.nytimes.com/2024/05/06/climate/nyt-questions-flight-offsets.html (last visited Dec. 11, 2024).

status. According to the study referenced in the previous paragraph, of the top fifty emission offset projects globally, **thirty-nine (78%) were categorized as "likely junk or worthless."**[66] A further eight were categorized as "problematic" and "potentially junk."[67] For example, one of the emission reduction projects involved a program in wester Kenya that sought to replace woodburning stoves that are frequently used to boil water—causing significant greenhouse gas emissions.[68] However, the project "inflated baseline figures on how many households used firewood to heat water, and exaggerated claims" of emissions reductions.[69] Consequently, the "offset credits" companies purchased did not actually reduce emissions in the proffered amount.

52.     The projects in which Defendant claims to invest and, purportedly, offset its emissions mirror similar projects that are known to be fraudulent or misleading. Defendant has not chosen to disclose specific details about the offsets in which it invests. Nevertheless, Change Climate publicly asserts that Defendant has invested in "projects that help communities replace inefficient wood-burning cookstoves with more efficient, safer, models;" "projects that support wind energy generation;" and "projects that support solar power generation."[70] In addition to the inaccurate stove-replacement project discussed in the prior paragraph, a study performed by Corporate Accountability and The Guardian found that "[f]ifteen of the 16 renewable energy projects (examined in the study), which include dams, solar and wind, are likely junk—mostly

---

[66] Nina Lakhani, *Revealed: Top Carbon Offset Projects May Not Cut Planet-Heating Emissions*, THE GUARDIAN (Sep. 19, 2023) https://www.theguardian.com/environment/2023/sep/19/do-carbon-credit-reduce-emissions-greenhouse-gases (last visited Dec. 11, 2024).
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Clif Kid*, CHANGE CLIMATE, https://explore.changeclimate.org/brand/clif-kid?_gl=1*1sbh049*_gcl_aw*R0NMLjE3MzEwNzQ1NDMuRUFJYUlRb2JDaE1JcDVpXy1Q SE1pUU1Wdml6VUFSMU9qUldvRUFBWUFpQUFFZ0tCZWZEX0J3RQ..*_gcl_au*MTg5M TgxOTgyNC4xNzMwOTkzNzk1*_ga*NDE3MTkwMjc1LjE3MzA5OTM3OTU.*_ga_1SDE6P M5XZ*MTczNDk4MTY0OS4zOS4wLjE3MzQ5ODE2NDkuNjAuMC4w (last visited Dec. 23, 2024).

because the project would have almost certainly happened anyway."[71] Upon information and belief, these projects—like their analogues in the aforementioned study—fail to provide the environmental benefit they claim. Accordingly, these projects cannot substantiate Defendant's climate neutral claim.

53.     These projects exemplify a systemic problem in the offset credit market. Journalist Lisa Song reports: "[i]n case after case…carbon credits hadn't offset the amount of pollution they were supposed to, or they had brought gains that were quickly reversed or that couldn't be accurately measured to begin with. Ultimately, the polluters got a guilt-free pass to keep emitting CO2, but [the emissions reduction project] that was supposed to balance the ledger either never came or didn't last."[72]

54.     In light of the complexity and uncertainty surrounding offset marketing, the FTC created specific guidelines. These guidelines provide that:

> Given the complexities of carbon offsets, sellers should employ competent and reliable scientific and accounting methods to properly quantify claimed emission reductions and to ensure that they do not sell the same reduction more than one time. It is deceptive to misrepresent, directly or by implication, that a carbon offset represents emission reductions that have already occurred or will occur in the immediate future. To avoid deception, [an organization selling an offset] should clearly and prominently disclose if the carbon offset represents emission reductions that will not occur for two years or longer.[73]

55.     The FTC's guidelines demonstrate that environmental marketing claims are unfair and/or deceptive if they are made in an unqualified manner or without a clear, readily available explanation. Further, because offsets are particularly complex and unknown to most consumers, the FTC's guidance highlights the necessity that companies properly and conspicuously advertise

---

[71] Lakhani, *supra* note 66.
[72] Umair Irfan, *Can You Really Negate Your Carbon Emissions? Carbon Offsets, Explained*, VOX, (Feb. 27, 2020) https://www.vox.com/2020/2/27/20994118/carbon-offset-climate-change-net-zero-neutral-emissions (last visited Dec. 11, 2024).
[73] 16 C.F.R. § 260.5.

the *reliability* of the claimed emission reductions. Otherwise, environmental claims such as Defendant's that its Product is "climate neutral" are likely to deceive reasonable consumers.

56.     In response to the increase in environmental marketing claims targeting the growing number of American consumers interested in environmentally friendly products, the FTC launched the "Green Guides." The Guides seek to "help marketers avoid making environmental marketing claims that are unfair or deceptive."[74] Determining "[w]hether a particular claim is deceptive [to a general audience of consumers] will depend on the net impression of the advertisement, label, or other promotional material at issue."[75]

57.     The Green Guides pay special attention to "general environmental benefit claims." Indeed, the Guides state that:

> It is deceptive to misrepresent, directly or by implication, that a product … offers a general environmental benefit. Unqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings. … Because it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, marketers should not make unqualified general environmental benefit claims…Even if a marketer explains, and has substantiation for, the product's specific environmental attributes, this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims. Therefore, marketers should ensure that the advertisement's context does not imply deceptive environmental claims.[76]

58.     "Climate neutral" is an "unqualified general environmental benefit" claim. As alleged above, "climate neutral" does not have a widely understood definition and is subject to multiple reasonable interpretations. Most importantly, companies like Defendant cannot "substantiate all reasonable interpretations" of "climate neutral" because the companies themselves emit significant amounts of greenhouse gasses that contribute to climate change, and the offset market is highly suspect, inaccurate, and fundamentally unreliable.

---

[74] 16 C.F.R. § 260.1(a).
[75] 16 C.F.R. § 260.1(d).
[76] 16 C.F.R. § 260.4(d).

3.    *The Product and Its Climate Neutral Certified Claim*

59.    Defendant manufactures, markets, advertises, labels, packages, and sells its Product—Clif Kid ZBars and Clif Kid ZBar Protein—in five flavors and a variety of quantities (six, ten, twelve, and thirty-six packs of individually-wrapped bars).

60.    On each version of the Product, as well as on each individual bar, Defendant represents the Product as "climate neutral certified". Defendant charges a price premium based on this representation and consumers, because of a belief that the product is "climate neutral" and environmentally friendly, pay more for the Product.

61.    Nowhere on any of the Product's packaging does Defendant define what "climate neutral" means, disclose that the claim is based on the Change Climate Project's calculations, how consumers might access additional information on the subject, or where they might look for such information. Because Defendant does not define "climate neutral," reasonable consumers, including Plaintiff, can and do interpret and believe "climate neutral" to mean that the manufacturing of the Product—from materials used, to production, to transportation—is sustainable and does not exert a net negative effect on the environment nor contribute to climate change. This representation is false. Clif Kid emits nearly 54,000 tons of carbon dioxide equivalent annually in manufacturing and distributing the Product.[77] Despite believing that their purchase is a "climate neutral" choice, unbeknownst to them, Plaintiff and other consumers of the Product play an active role in contributing to the Product's substantial impact on the climate. Therefore, Defendant's climate neutral claim misleads reasonable consumers.

62.    Even assuming reasonable consumers understand "climate neutral" to mean that Defendant's investment in "eco-friendly" projects theoretically offset its own contributions to

---

[77] *Clif Kid*, CHANGE CLIMATE, https://explore.changeclimate.org/brand/clif-kid (last visited Dec. 17, 2024).

climate change—something reasonable consumers do not understand—Defendant's representations would still be misleading.

63.     Through its use of "climate neutral certified", Defendant may be attempting to represent that "climate neutral" means the Product meets the Change Climate Project's unique specifications. However, a reasonable consumer would have no way to know this is the case. There is no reference to the Change Climate Project anywhere on the packaging, nor is there a link to changeclimate.org, or a prompt for consumers to "learn more" about what "climate neutral certified" means. Thus, a reasonable consumer would understand that Defendant itself is "certifying" the Product as "climate neutral." Defendant, then, must substantiate the claim that the Product actually is "climate neutral." Unfortunately, it cannot.

64.     Defendant could have reduced the risk of deception by following the Green Guides' recommendation that marketers using third-party certifications accompany such representations with "clear and prominent language clearly conveying that the certification refers only to specific and limited benefits."[78] However, Defendant opted not to include such language.

65.     This is precisely the kind of misleading and deceptive use of environmental certification addressed by the Green Guides.[79] Marketers must substantiate all reasonable interpretations of claims explicit and implicit in a third-party seal of certification—especially where the existence of a third party is not disclosed.[80]

66.     Even if it was clear that Defendant's use of "climate neutral" refers to the fact that it meets the standards set by the Change Climate Project, the claim would still be misleading. Nowhere on the packaging does Defendant explain what the Change Climate Project is, what

---

[78] 16 C.F.R. § 260.4.
[79] 16 C.F.R. § 260.6.
[80] 16 C.F.R. § 260.3.

"climate neutral" certification entails, or how Defendant goes about achieving the Change Climate Project's standards.

67.     Moreover, whatever carbon offsetting standards Change Climate chooses to use are fundamentally problematic. As alleged earlier, the emissions offsetting industry is beset with inaccurate and obfuscated data such that "[c]limate finance consultants and environmental groups are sounding the alarm about a system [*i.e.*, the carbon offsetting industry] they say doesn't deliver anywhere near the carbon reductions promised but offers companies a convenient way to avoid the tougher work of actually cutting emissions."[81] Offsetting relies on inherently speculative calculations as to the effects of projects which may or may not succeed in actually reducing global greenhouse gas emissions.

68.     So, even if these offset claims were true (which they are not), and completely and conspicuously substantiated on the Product's packaging (which they are not), the "climate neutral" claim would still be misleading. The FTC's guidance supports Plaintiff's contentions. As the Green Guides explain:

> Even if a marketer explains, and has substantiation for, the product's specific environmental attributes, *this explanation will not adequately qualify a general environmental benefit claim if the advertisement otherwise implies deceptive claims.* Therefore, marketers should ensure that the advertisement's context does not imply deceptive environmental claims.[82]

69.     The "climate neutral certified" claim at issue here implies, and reasonable consumers interpret the claim to mean, that the manufacturing of the Product is sustainable and does not contribute to climate change or degradation. As alleged above, this representation is false

---

[81] Josh Lederman, Corporations Are Turning to Forest Credits in the Race To Go "Carbon-neutral." Advocates Worry About "Greenwashing.", NBC NEWS (Dec. 5, 2021), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259 (last accessed Dec. 9, 2024).
[82] 16 C.F.R. § 260.4(d) (emphasis added).

because the Product's lifecycle releases significant amounts of greenhouse gases. Crucially, Defendant has not properly qualified its "climate neutral certified" claim nor specified what, precisely, it means thereby. Accordingly, the "climate neutral certified" claim is misleading because it implies deceptive claims.

70.     In summation, Defendant markets the Product as "climate neutral certified" and charges a price premium based on this representation. However, Defendant fails to disclose that it is not Defendant itself conferring "climate neutral" certification. Accordingly, Defendant is responsible for the implicit claim that the Product itself is "climate neutral." Because Defendant does not qualify this claim in a conspicuous or reasonable manner, the "climate neutral" claim comprises a "general environmental benefit" claim for which Defendant must substantiate all reasonable interpretations. As alleged above, Defendant cannot substantiate all reasonable interpretations. Reasonable consumers like Plaintiff interpret "climate neutral" to mean the Product's lifecycle does not contribute to climate change or degradation. In fact, the manufacturing and transportation of the Product makes a significant contribution to climate change and degradation. Plaintiff and other likeminded consumers would not have purchased the Product—or would have paid substantially less for it—had they known the "climate neutral" claim was not true. Even if the claim is meant to tout Defendant's investment in climate-friendly projects that theoretically offset its own emissions, that too would be misleading in light of the systemic inaccuracy in the emissions offset market. Moreover, Defendant does not substantiate this claim with how it reduces its emissions or calculates the offsets. Accordingly, the "climate neutral" claim is misleading and deceives consumers into paying more for the Product than they otherwise would have.

## CLASS ALLEGATIONS

71.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself, a Nationwide Class of similarly situated individuals defined as "all consumers who purchased the Products within the United States during the applicable statute of limitations period and until the date of class certification." (the "National Class"), and a Subclass of California citizens who purchased the Product in California (the "California Subclass"). Excluded from the Class are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators, and anyone who purchased the Product for resale. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

72.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and Subclass may be expanded or narrowed by amendment or amended complaint.

73.     <u>Numerosity,</u> Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of individuals who purchased the Product during the relevant time period. Although the exact number of Class Members is unknown to Plaintiff, such number is known by Defendant and may be ascertained through Defendant's records.

74.     <u>Commonality and Predominance,</u> Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

        a.     Whether, and in which proportion, Defendant is responsible for the advertising and packaging at issue;

b.  Whether the advertising of the Product was unfair, false, deceptive, and/or unlawful;

c.  Whether Defendant's conduct was unfair and/or deceptive;

d.  Whether Defendant knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of various consumer protection laws and the warranties related to the Product;

e.  Whether Plaintiff and the Class paid more money for the Product, or purchased more, than they would have had Defendant not engaged in the misrepresentations and omissions described herein.

f.  Whether Defendant breached an express warranty created through the marketing of the Product;

g.  Whether Defendant was unjustly enriched by its unlawful conduct; and

h.  Whether Plaintiff and the Class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

75.  Concerning the Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.* and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

76.  Typicality, Fed. R. Civ. P. 23(a)(3): The claims of the named Plaintiff are typical of the claims of other members of the Class in that the named Plaintiff was exposed to Defendant's false and misleading marketing, purchased the Product, and suffered a loss as a result. Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of

herself and the Class. Defendant's unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

77. <u>Adequacy of Representation</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of rights and the damages suffered by Plaintiff are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation and Plaintiff intends to prosecute this action vigorously.

78. <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the

asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court.

79.     The nature of this action and the nature of the laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

80.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

81.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

82.     No Class Member has a substantial interest in individually controlling the prosecution of a separate action.

83.     The prerequisites to maintaining a class action for equitable relief are met. By representing that the Product is "climate neutral," Defendant has acted or refused to act on grounds

generally applicable to the Class, thereby making appropriate final equitable and monetary relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Breach of Express Warranty
### (On behalf of Plaintiff and the National Class)

84. Plaintiff, on behalf of herself and the Class, realleges and reincorporates by reference all preceding paragraphs of this Complaint as if set forth fully herein.

85. By advertising and selling the Product at issue, Defendant made promises and affirmations of fact. These promises and affirmations include those found on the Product's labeling, packaging, and categorization, as well as through its marketing and advertising. The "climate neutral" claim constitutes an express warranty and became part of the basis of the bargain between Plaintiff and Class Members on the one hand and Defendant on the other.

86. Defendant purports, through the "climate neutral" claim, to create an express warranty that the Product does not contribute to climate change or degradation.

87. Despite this express warranty about the nature of the Product, the Product does contribute to climate change and degradation for reasons discussed above. The Product is, therefore, not what Defendant represented it to be.

88. Accordingly, Defendant breached an express warranty about the Product and its qualities because the Product does not conform to Defendant's affirmation and promise that the Product is "climate neutral."

89. As a direct and proximate result of Defendant's breach of express warranty, Plaintiff and Class Members were harmed in the amount of the purchase price they paid for the Product and are entitled to those damages, and other damages to be proven at trial.

**COUNT II**
**Violation of California's Consumers Legal Remedies Act**
**Cal. Civ. Code §§ 1750,** *et seq.*
**(On behalf of Plaintiff Salguero and the California Subclass)**

90.     Plaintiff Salguero, on behalf of herself and the California Subclass realleges and reincorporates by reference all preceding paragraphs of this Complaint as if set forth fully herein.

91.     The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property, or services to consumers primarily for personal, family, or household use.

92.     Defendant is a "person" as defined by Cal. Civ. Code §§ 1761(c) and 1770 and has provided "services" as defined by Cal. Civ. Code §§ 1761(b) and 1770.

93.     Plaintiff and the California Subclass Members are "consumers" as defined by California Civil Code §§ 1761(d) and 1770.

94.     The Product is a "good," as defined by the CLRA in Cal. Civ. Code § 1761(a).

95.     Plaintiff's and the California Subclass Members' purchase of the Product are "transactions," as defined by the CLRA in Cal. Civ. Code § 1761(e).

96.     The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful." Cal. Civ. Code §§ 1761(b), 1770(a).

97.     Defendant's acts and practices were intended to and did result in the sale of products and services to Plaintiff and the California Subclass Members in violation of Cal. Civ. Code § 1770, including:

a. Representing that goods or services have characteristics or benefits that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade when they were not; and

c. Advertising goods or services with intent not to sell them as advertised.

98. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers. Indeed, Defendant violated Section 1770(a)(5) by representing that the Product has "characteristics…uses, [or] benefits…which [it does] not have" when Defendant falsely labeled the Product as being "climate neutral." Defendant knew that consumers would pay more for products that have these kinds of attributes and have unfairly profited from their false and misleading claims.

99. Similarly, Defendant violated Section 1770(a)(7) by representing that the Product "[is] of a particular standard, quality, or grade when [it is] not" by falsely and deceptively labeling and advertising the Product as "climate neutral."

100. Further, Defendant violated Section 1770(1)(9) by advertising the Product with the intent not to sell it as advertised in that the Product is falsely labeled and advertised as "climate neutral."

101. Defendant's uniform and material representations and omissions regarding the Product were likely to deceive, and did deceive consumers, and Defendant knew or should have known that its representations and omissions were untrue or misleading.

102. Plaintiff Salguero and the California Subclass Members could not have reasonably avoided such injury. Plaintiff and the California Subclass Members would not have purchased the Product and/or would have purchased the Product on different terms had they known the truth.

103. As a direct and proximate result of Defendant's violations of California Civil Code § 1770, Plaintiff Salguero and California Subclass Members have suffered and will continue to suffer injury and damages.

104. Given that Defendant's conduct violated Section 1770(a), Plaintiff Salguero and California Subclass Members have been directly and proximately injured by Defendant's conduct. Such injury includes, but is not limited to, the purchase price of the Product.

105. Moreover, Defendant's conduct was malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers in order to increase the sale of the Product at a higher price than Defendant's competitors.

106. On February 21, 2025, pursuant to Cal. Civ. Code § 1782(a), Plaintiff, individually and on behalf of those similarly situated, notified Defendant of the alleged violations of the CLRA as described above and demanded that it correct the problems associated with the actions detailed in this complaint and give notice to all affected consumers. Defendant has failed to rectify the problems identified within the 30-day period outlined in the CLRA. Accordingly, Plaintiff now seeks injunctive relief to enjoin Defendant from continuing its deceptive advertising and sales practices, equitable relief, and damages—including actual and statutory damages, for Defendant's violations of the CLRA.

107. Pursuant to Cal. Civ. Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff and the California Subclass seek a declaration that Defendant's conduct violates the CLRA, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

<u>COUNT III</u>
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(on behalf of Plaintiff Salguero and the California Subclass)**

108.     Plaintiff Salguero, on behalf of herself and the California Subclass, realleges and reincorporates the preceding paragraphs of this Complaint as if set forth fully herein.

109.     Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

110.     Defendant violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

**Unlawful Prong**

111.     Defendant has engaged in "unlawful" business practices by violating California Civil Code Section 1750, *et seq*.

112.     Defendant's labeling, advertising, and marketing of the Product, as alleged herein, is false, deceptive, misleading, and unreasonable, and constitutes unlawful conduct.

**Fraudulent Prong**

113.     Defendant's labeling, marketing, and advertising of the Product as "climate neutral" when it contributes to climate change and degradation is likely to deceive consumers.

114.     Defendant's labeling marketing, and advertising of the Product is false, misleading, deceptive, and unreasonable. Defendant also had reasonably available alternatives, such as not touting the Product as "climate neutral."

**Unfair Prong**

115. Defendant's labeling of the Product as "climate neutral" when, in fact, it contributes to climate change and degradation is unfair because consumers do not receive products commensurate with the consumers' reasonable expectations.

116. Defendant's labeling of the Product as "climate neutral" when, in fact, it contributes to climate change and degradation is unfair because consumers end up overpaying for the Product and receiving a product of lesser standard than what they reasonably expected to receive.

117. Consumers cannot avoid any of these injuries caused by Defendant's deceptive labeling and advertising of the Product. Accordingly, the injuries Defendant caused outweigh any possible benefit, if any exists from the "climate neutral" claim.

118. Defendant's "climate neutral" claim is false, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct.

119. There existed reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Product as "climate neutral."

120. All of the conduct alleged herein continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on a daily basis.

121. Plaintiff and the California Subclass have suffered injuries in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Product, or otherwise bargained for a product they did not receive. Specifically, Plaintiff and the California Subclass paid for a Product that contributed to climate change and degradation and exerted a negative impact on the environment. Plaintiff and the

California Subclass would not have purchased the Product, would have paid substantially less for the Product, or would have purchased the Product under different terms if they had known that the Product's advertising and labeling was deceptive.

122. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the nature and quality of the Product.

123. As a direct and proximate result of Defendant's unlawful and fraudulent acts and practices which are also unfair to consumers, Plaintiff and California Subclass Members were injured and suffered damages.

124. Mondelez acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and California Subclass Members' rights.

125. Plaintiff and California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Mondelez's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**COUNT IV**
**Unjust Enrichment**
**(On behalf of Plaintiff and the National Class)**

126. Plaintiff, on behalf of herself and the Class, reallege and reincorporate the preceding paragraphs of this Complaint as if set forth fully herein.

127. By purchasing the Product, Plaintiff and Class Members conferred a benefit on Defendant in the form of the purchase price of the Product.

128. Defendant had knowledge of such benefit.

129.    Defendant appreciated the benefit because, were the consumers not to purchase the Product, Defendant would not generate revenue from the sale of the Product.

130.    Defendant's acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent and misleading representations and omissions.

131.    Plaintiff and Class Members seek return of all monies Defendant acquired by way of its unlawful conduct.

132.    Therefore, Plaintiff prays for relief as set forth below.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant as follows:

a)  For an order certifying the National Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

b)  For an order declaring Defendant's conduct in violation of the statutes referenced herein;

c)  For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

d)  For compensatory and statutory damages in amounts to be determined by the Court and/or jury;

e)  For prejudgment interest in all amounts awarded;

f)  For an order of restitution and all other forms of equitable monetary relief;

g)  For an order awarding Plaintiff and the Class and Subclass their reasonable attorney's fees and expenses and costs of suit; and

h)  Such other relief the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

Dated: May 16, 2025

*/s/ Brian C. Gudmundson*

David M. Cialkowski, IL Bar No. 6255747
Brian C. Gudmundson
Rachel K. Tack
Benjamin R. Cooper
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
rachel.tack@zimmreed.com
benjamin.cooper@zimmreed.com

Joseph M. Lyon
Kevin M. Cox
Alex Reid
**THE LYON FIRM**
2754 Erie Ave.
Cincinnati, OH 45208
Telephone: (513) 381-2333
jlyon@thelyonfirm.com
kcox@thelyonfirm.com

Christopher D. Jennings
Tyler B. Ewigleben
**JENNINGS & EARLEY PLLC**
500 President Clinton Avenue, Suite 110
Little Rock, AR 72201
Telephone: (501) 247-6267
chris@jefirm.com
tyler@jefirm.com

*Counsel for Plaintiff and the Putative Class*